374 P.2d 20

**RIMLEDGE URANIUM AND MINING CORPORATION and Kenneth J. McCormick, Plaintiffs and Appellants,**

v.

**FEDERAL RESOURCES CORPORATION, and Hecla Mining Company, Defendants and Respondents.**

No. 9604.

Supreme Court of Utah.

Aug. 22, 1962.

---

Brayton, Lowe & Hurley, Salt Lake City, and Delaney & Balcomb, Glenwood Springs, Colo., for appellants.

Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, and Chas. E. Horning, Wallace, Idaho, for respondents.

CALLISTER, Justice.

Plaintiffs instituted this suit for an accounting of royalties due from defendants and for a declaratory judgment as to the proper basis for determining the royalties. From a summary judgment in favor of defendants, plaintiffs appeal.

In 1953 Robert B. Daniel and A. T. Pryor, Sr. located upon the Colorado Plateau some mining claims known as the "Radon group." In the same year these locators executed a mining deed to one Reuckhaus, as trustee, in which was reserved "a royalty of fifteen per cent (15%) of *all gross proceeds from the sale of ore* from said claims, *the gross proceeds to include any bonuses or premiums upon the ore mined, but shall not include transportation and development allowances paid or granted to the lessees.*" (emphasis added)

In November, 1954, Daniel and Pryor assigned to U & I Uranium Corporation

one-third of their royalty interest. The royalty basis in this assignment was "the net mill or smelter returns from any or all ore to be thereafter shipped or produced from said mining ground." U & I then conveyed to W. E. McCormick "two-fifths (2/5) of said five per cent (5%) royalty, being a two per cent (2%) royalty from gross sales of all ore that may be taken from said ground." This assignment also recited that U & I had purchased from Daniel and Pryor "one-third (1/3) of said royalty so reserved, being a royalty of five per cent (5%) of the gross sales of ore from said mining ground."

W. E. McCormick then assigned to plaintiff Rimledge Uranium and Mining Corporation "a royalty interest of two per cent (2%) of gross sales of ore extracted *  * from *  *  * the Radon group." Rimledge then conveyed to plaintiff Kenneth J. McCormick "a gross royalty of twenty-five hundredths of one per cent (.25%) of the gross proceeds from the sale of ores and minerals extracted, mined, removed and sold. *  *  *"

Prior to the assignment by W. E. McCormick to Rimledge, he quitclaimed to the predecessor of defendant Federal Resources Corporation any interest he might have in the mining claims apart from his royalty interest. In return he was given a letter relating to his royalty interest. This letter contained the following:

"Federal Uranium Corporation hereby acknowledges and confirms that you are the owner of a royalty of two per cent (2%) *of all the gross proceeds from the sale* of all ore from the lode mining claims listed above, *the gross proceeds to include any bonuses or premiums upon the ores mined, but shall not include transportation and development allowances* paid or granted to the owners of said claims; it is further acknowledged that the aforesaid royalty of two per cent (2%) of all gross proceeds, as above specified, shall be paid by the ore depot or purchaser directly to you. *  *  *" (Emphasis added.)

Under the Atomic Energy Act of 1946[1] ownership of all uranium in the public domain was reserved to the United States, and under the same act, the Atomic Energy Commission was created to administer the government's uranium program. Under its regulations, the AEC or its authorized agents were designated as the sole authorized purchasers of uranium ore. During all times pertinent hereto there was in effect AEC Domestic Uranium Program Circulars 5 and 6. Circular 5 established minimum guaranteed prices for uranium ore produced on the Colorado Plateau and provided

1. 60 Stat. 755, 42 U.S.C.A. § 1805(b) (7), now 42 U.S.C.A. §§ 2061–2112.

for development and transportation allowances. Circular 6 provided for the payment of bonuses for ore sold to the AEC from eligible mining claims.

In August, 1955, defendants began selling unconcentrated uranium ore from the Radon mining claims to the AEC. The ore was sold to the AEC at the prices set forth in Circular 5. In the early part of 1957 the Uranium Reduction Company completed a mill at Moab, Utah, and defendants obtained a license from the AEC to sell ore to URC. The initial contract between defendants and URC provided that the latter purchase the unconcentrated ore at Circular 5 prices.

Apparently to obtain a more favorable tax treatment, the defendants, on July 1, 1958, entered into a new arrangement with URC. Under this arrangement the defendants delivered the ore to the mill and retained title thereto until the milling process was completed, and then the concentrated ore was sold to URC. Two separate agreements were made: a Custom Milling Agreement and a Concentrate Purchase Agreement. Under the first it is provided the URC shall process ore for the defendants who, in turn, are required to pay certain processing charges. The Concentrate Purchase Agreement provided that URC would purchase the concentrate at an amount equal to Circular 5 prices plus milling charges.

Since ore was first sold in 1955, and continuing until the commencement of this lawsuit, the defendants have computed and paid the royalties based on Circular 5 prices for unconcentrated ore.

Plaintiffs brought this action for an accounting and a declaratory judgment that the royalties were to be computed on the gross proceeds of the sale of the ore, meaning the proceeds derived from the sale of the concentrated ore to URC without deductions for milling charges. Defendants moved for a summary judgment asking that the royalty basis be determined as the sale price of raw ore or, if there is no such sale, the value of raw ore in the vicinity in which the ore is mined, or in the alternative, on the proceeds of the sale of the concentrated ore less plaintiffs' proportionate share of the costs of milling. Plaintiffs made a cross-motion for summary judgment asking that the defendants be ordered to render an accounting of "2% of all gross proceeds from the sale of all ore * * * based upon the sale price actually received."

In granting defendants' motion for summary judgment and denying plaintiffs', the lower court ruled that the royalty was to be based on the selling price of raw ore, and if raw ore as such is not sold, but is processed by the defendants, then the royalty is to be based on the fair market value of raw ore in the vicinity. Alternatively, at the

election of the plaintiffs, the royalty is to be based upon the proceeds derived from the sale of the concentrated ore, but plaintiffs' proportionate share of the milling costs are to be deducted.

The lower court further ordered that "the plaintiffs have and recover nothing by their suit. * * *"

Plaintiffs, upon this appeal, argue that the lower court misconstrued the provisions providing for royalties, but that no matter what might be the proper basis for computing the royalties, they should not be precluded from an accounting.

The initial question presented is whether the term "gross proceeds" as used in the various assignments means the sale price of raw ore, (or the value of the raw ore if not sold in this form) or whether it means the sale price of the concentrated ore without any deduction for the milling costs.

Plaintiffs place great stress upon the dictionary definitions of the words, "gross," "proceeds," "sale," and "ore." We do not quarrel with these definitions in the abstract. However, the term "gross proceeds," regardless of any abstract definition must be defined and construed in terms of the concrete context in which it was used in the various assignments. Specifically, at what stage of the whole commercial process did the parties intend "gross proceeds" to apply?

It is our opinion, considering all the factors involved and the case authority (none of which is very close in point), that the parties intended the base for royalty payments to be the proceeds realized from the sale of raw ore, or, if there is no sale of raw ore, then the fair market value of raw ore in the vicinity of the mining activities.

At the time of the creation of the royalty interest involved, the only available market for uranium ore was that provided for under AEC Circulars 5 and 6. The parties recognized the controlling influence of these circulars upon the proceeds to be realized from the sale of ore. They provided that "haulage" and "development" allowances (payable under Circular 5) would be excluded, but that "bonuses" (payable under Circular 6) would be included in computing the gross proceeds from which the royalty payments would be made. The concept of "haulage" and "development" allowances and "bonuses" is peculiar to the AEC purchasing program.

Moreover, some evidence that the parties did not intend the royalty to be based on the selling price of concentrated ore, as opposed to raw, is found in the fact that when the royalty was created in 1953, there were no mills in the area to which ore from the Radon claims could be sold or processed. Consequently, to argue that "gross proceeds" means the selling price of concen-

trated ore would be to argue that the parties provided for a royalty for which there was no initial base upon which to compute it.

To argue that the parties intended that "gross proceeds" implies a different basis at different times is quite unrealistic. Plaintiffs do not contend that the royalty was wrongfully computed when defendants were selling raw ore to the AEC or URC. To contend now that "gross proceeds" means raw ore under those circumstances but concentrated ore in the context of this case is to allow the elasticity of words to distort the intent of the parties who used them. Under plaintiffs' theory, if logically pursued, they would be entitled to the gross proceeds of the sale of ore, as long as it remained ore, no matter how much value had been added by the defendants, and the plaintiffs would reap the advantage of this added value created by the defendants at the latter's expense.

The case authorities, nearest in point, are not inconsistent with our interpretation.

These authorities do not allow royalties to be based on the additional value that accrues from some act by the party obligated to pay the royalty such as transportation,[2] refining,[3] dehydrating,[4] or marketing.[5] Although the parties may obviously provide for any royalty arrangement they wish, we are of the opinion that whether the words employed to designate the royalty basis are "market value,"[6] "proceeds,"[7] or "gross proceeds,"[8] they do not mean, under normal circumstances that the value added to the product shall redound to the benefit of a royalty owner who does not bear his proportionate share of the costs.

Although we are satisfied that the parties intended a royalty based on the gross proceeds of the sale of raw ore (or fair market value in the vicinity, if no sale), we are not altogether certain that it was proper for the lower court to give the plaintiffs an election, as to future royalties, between that basis and the basis of proceeds from the sale of concentrated ore less milling expenses. Defendants maintain that the two bases are the

2. Matzen v. Hugoton Production Co., 182 Kan. 456, 321 P.2d 576, 73 A.L.R.2d 1045.

3. Danciger v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321.

4. Western Gulf Oil Co. v. Title Ins. & Trust Co., 92 Cal.App.2d 257, 206 P.2d 643.

5. Vedder Petr. Corp. v. Lambert, 50 Cal. App.2d 102, 122 P.2d 600.

6. e. g. Freeland v. Sun Oil Co., D.C., 184 F.Supp. 754, aff'd. 277 F.2d 154.

7. e. g. Matzen v. Hugoton Production Co., supra, note 2.

8. See: Warfield Natural Gas Co. v. Allen, 261 Ky. 840, 88 S.W.2d 989, where the term "proceeds" was determined to mean "gross proceeds."

equivalent of each other, but plaintiffs claim that there may be factors causing them to be different.

Since we cannot determine with any certainty from the record or briefs whether the two royalty bases would have the same result in all instances, we hold that the accounting which must be had should be upon the basis of the gross proceeds of the sale of raw ore or the fair market value in the vicinity. It would seem that the proceeds from the sale of concentrated ore less milling expenses would be competent evidence as to the market value.

As to future royalties, we are constrained to leave standing the lower court's ruling granting to plaintiffs an election as to the royalty basis to be used inasmuch as none of the parties has taken issue with this ruling upon appeal.

The lower court erred in dismissing plaintiffs' complaint. The motions for summary judgment related solely to the legal question of the proper basis for the royalty payments. After this question was resolved the plaintiffs were entitled to an accounting as prayed for in their complaint.

Affirmed in part and reversed in part. Case remanded for proceedings consonant with the views expressed in this opinion. No costs awarded.

WADE, C. J., and HENRIOD, Mc-DONOUGH, and CROCKETT, JJ., concur.