Frank RICHARDSON et al., Appellants,

v.

**HOMESTAKE MINING COMPANY, a**
California corporation, Appellee.

No. 7244.

United States Court of Appeals
Tenth Circuit.

Sept. 3, 1963.

William G. Waldeck, Montrose, Colo.
(Petrie, Waldeck & King, Montrose,
Colo., D. A. Frandsen, and Frandsen &
Keller, Price, Utah, were with him on
the brief), for appellants.

Leonard J. Lewis, Salt Lake City, Utah
(Van Cott, Bagley, Cornwall & Mc-
Carthy, Dennis McCarthy, C. Keith
Rooker, Salt Lake City, Utah, Brobeck,
Phleger & Harrison, Alvin J. Rockwell,
John M. Naff, Jr., San Francisco, Cal.,
Kellar, Kellar & Driscoll, and Kenneth
C. Kellar, Lead, S. D., were with him on
the brief), for appellee.

Before MURRAH, Chief Judge, and
BRATTON and HILL, Circuit Judges.

BRATTON, Circuit Judge.

Frank R. Richardson and others in-
stituted this action against Homestake
Mining Company, a corporation, and the
determinative issue between the parties
was the basis upon which the defendant
was obligated to pay royalty to the plain-
tiffs under a lease covering certain un-
patented mining claims located in San
Juan County, Utah. The lease provided
for payment of a royalty of fifteen per
cent of the gross value of the ores, min-
erals and metals extracted from the land.
And it defined gross value to mean the
net returns derived from the sales of
ores, minerals, and metals extracted and

removed from the claims, excluding development and haulage allowances, but including premiums and bonuses other than development and haulage allowances. The substance of the asserted grievance of plaintiffs was that during the period in controversy, the defendant before calculating the royalty deducted from gross returns charges for processing by mill treatment raw ore into uranium concentrate and also deducted development allowances. Judgment for an accounting and recovery in money was sought. The defendant admitted making the deductions but asserted that they were proper. And by counterclaim, the defendant sought a declaratory judgment determining the meaning of the lease in respect to calculating the royalty. After certain discovery procedures, many of the facts were stipulated. The court made findings of fact and conclusions of law. By its judgment, the court denied plaintiffs recovery in any amount. It also determined in substance that in respect to raw ore sold prior to March 31, 1962, the royalty should be calculated at the prices, premiums, bonuses and allowances established by Circular 5, promulgated by the Atomic Energy Commission of the United States, revised, less a development allowance in the amount of fifty cents per pound for ore of a specified grade, and haulage allowance in the amount of six cents per wet ton mile. And it also determined that in respect to concentrate produced from raw ore and sold prior to March 31, 1962, the royalty should be calculated upon the proceeds derived therefor by the defendant, less milling charges, the development allowance, and the haulage allowance.

·These were the basic facts in which the litigation had its source. Circular 5 was in effect from March 1, 1951, through March 31, 1962. It established prices, premiums, and allowances, including a development allowance of fifty cents per pound for ore of a specified uranium content, a haulage allowance, and the other bonuses and premiums in respect to raw uranium bearing ores taken from the Colorado Plateau area. The

land covered by the lease was within that area. The Circular also provided that persons accepting the development allowance were deemed to agree to spend such funds for the development and exploration of their properties. And it further provided that persons delivering in excess of 1,000 short tons per calendar year would be required under the terms of their contracts to submit proof satisfactory to the Commission that funds equivalent to the amount received as development allowance had been spent for development. In 1956, the Circular was amended to eliminate therefrom the requirement for the submission of proof that the funds received as development allowance had been expended for such purpose.

The lease was entered into in 1954. Homestake, at its cost and expense, commenced an exploration and development program; and about June, 1957, it commenced mining ore from the claims. In 1955, Uranium Production Company entered into a contract with the Commission by which it received authority to construct a uranium mill, to mill and treat uranium ore, and to purchase from mine operators concentrate produced therefrom. The contract provided among other things that ore purchased from mine operators should be purchased and acquired at prices, premiums, and allowances, upon terms and conditions, and subject to specifications not less favorable to the seller than the provisions of Circular 5. And it further provided that Uranium Reduction should obtain from each ore producer an understanding in writing obligating the producer to account directly to the Commission for the expenditure of the development allowance paid by Uranium Reduction to the producer. In October, 1956, Uranium Reduction completed its mill at Moab, Utah. Prior to the completion of the mill, no means existed whereby Homestake could obtain custom milling of raw ore extracted from the land covered by the lease.

As of July 1, 1957, Homestake and Uranium Reduction entered into two con-

tracts. One was a custom milling agreement and the other was a concentrate purchase agreement. Both were renegotiated but the changes have no present material bearing. None of the plaintiffs were parties to the contracts. Under the milling agreement, Uranium Reduction was obligated to process ore delivered to it by Homestake and Homestake was to pay the cost of the processing. In the concentrate purchase agreement, Uranium Reduction was obligated to purchase the finished product. And in calculating the price to be paid, the parties followed the prices, bonuses, premiums, and allowances, including development allowance, prescribed by Circular 5. One purpose of Homestake in entering into the contracts was to assure a market for the sale of ores extracted from the lands covered by the lease beyond the termination of the buying program of the Commission under Circular 5, on March 31, 1962. Another purpose on the part of Homestake in entering into the arrangement was a hope to gain taxwise, but the hope failed to materialize.

Reversal of the judgment is sought on the ground that the lease did not contain a provision authorizing a deduction from gross revenue of an amount for processing the raw ore before calculating the royalty. The lease did not contain a provision expressly authorizing the deduction. One explanation for the absence of such a provision which seems to suggest itself is that at the time of the execution of the lease there were no custom mills engaged in the business of processing raw ore at the cost of the producer. Mills of that kind entered the uranium field later. In any event, the cold language contained in a written agreement, standing alone, is not always absolute and unyielding. It is a general rule of wide acceptance that rights and obligations of parties under a written agreement sometimes exist even though not expressed therein. Sometimes such rights and obligations find their genesis in facts and circumstances which intervened after the execution of the writing, and sometimes they rest upon other footing. But it must appear with reasonable certainty that rights or obligations of that kind are necessary to carry into effect the intention of the contracting parties. Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 10 Cir., 176 F.2d 73, certiorari denied, 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581. It was within the intention and contemplation of the parties to the lease that Homestake would develop the property and market the uranium derived therefrom in the manner which would best serve the interest of the lessors and Homestake. As previously stated, one purpose on the part of Homestake in entering into the arrangement with Uranium Reduction was to assure a market for the sale of the ore extracted from the land covered by the lease after the termination of the buying program of the Commission under Circular 5, on March 31, 1962. And of course obtaining such a market was reasonably calculated to serve the best interest of both the lessors and Homestake. The recent case of Rimledge Uranium & Mining Corp. v. Federal Resources Corp., 13 Utah 2d 329, 374 P.2d 20, is markedly similar to this case. There the locators of mining claims executed a mining deed conveying the claims to a named grantee. Subsequently a quit claim deed and two assignments were executed. Each conveyance and each assignment contained a royalty provision quite close in substance to the royalty provision in the present lease to Homestake. Neither contained a provision authorizing a deduction of charges for processing raw ore into concentrate before calculating the royalty. Similar custom and milling and concentrate purchase agreements were entered into with Uranium Reduction and sales of concentrate were made to that company. It was contended that the basis for calculating the royalty was the selling price of the concentrate without any deduction for the processing charges. But the court rejected the contention and held in effect that the charges for processing the raw ore into concentrate should be taken into account in

calculating the royalty. That case constitutes a blueprint of the law of Utah which has controlling application in this case. Viewed in the light of its substance, we think that under the provisions and implications of the lease Homestake was authorized to enter into the contracts with Uranium Reduction, to sell the concentrate uranium to that company, and to deduct from gross revenue the amount paid for the processing charges before calculating the royalty under the lease.

■ The other ground of complaint is that Homestake wrongfully deducted from the revenue derived from sales of uranium concentrate an allowance for development before calculating the royalty. The lease made provision for the deduction of an allowance for development in arriving at gross value on which the royalty was to be calculated. It provided that the royalty should be calculated upon gross value of the ores, minerals and metals extracted from the land; and it defined gross value to mean net returns, excluding development and haulage allowances, but including premiums and bonuses other than development and haulage allowances. Circular 5, revised, made provision for such an allowance. It provided that the allowance should be in recognition of the expenditures necessary for maintaining and increasing developed reserves of uranium ores. And it fixed the amount of the allowance at fifty cents per pound for ore of a specified content of uranium. The purchase agreement into which Uranium Reduction and Homestake entered fixed a lump sum price of $8.00 per pound for concentrate, and a component part of the price was a development allowance of fifty cents per pound. It is manifest that in including in the purchase agreement a development allowance of fifty cents per pound as a component part of the total price to be paid for uranium concentrate, Uranium Reduction and Homestake followed the pertinent provision of Circular 5, revised. We think the deduction of that amount for that purpose from the sale of concentrate uranium fell well within the range of authority under the lease. And to disallow the deduction before computing the royalty would enable the lessors to enjoy unjust enrichment.

The judgment is affirmed.