428 P.2d 163

**Marian G. PRINCE, Plaintiff and Appellant,**

**v.**

**WESTERN EMPIRE LIFE INSURANCE COMPANY, a corporation, Defendant and Respondent.**

**No. 10671.**

Supreme Court of Utah.

June 1, 1967.

F. Clayton Nelson, St. George, Alfred K. Hambrick, Spencer, Okl., for appellant.

John S. Boyden, Salt Lake City, for respondent.

ELLETT, Justice:

This case involves the question of how effective is a "binding receipt" in the State of Utah.

On September 19, 1960, Doctor Robert Alpine Prince, a 37-year-old dentist, the husband of the plaintiff herein, filed an application with the defendant for an insurance policy on his life in the amount of $100,000. He paid the premium thereon for one year in advance and received a slip of paper known as a binding receipt. This slip of paper, after reciting that the money had been received, contained the following language:

> In connection with an application (bearing the same date and number as this receipt) to The Western Empire Life Insurance Company. This receipt shall operate as a Binding Receipt only under the conditions recited on the back hereof; otherwise, the liability of the Company is limited to the above amount, which shall

be held to the applicant's credit and subject to his order.

On the back of the slip was the following printed matter:

> Any insurance applied for in the application bearing the same date and number as the receipt on the reverse side hereof shall take effect on the date of the application or date of medical examination, if required, whichever is later, provided that (1) proposed insured is determined by the Company at its Home Office in Salt Lake City, Utah, in accordance with its rules and practices, to be insurable on such date for the policy exactly as applied for; (2) full first premium is paid in cash on date of application and declaration of such payment is made therein; (3) policy is issued exactly as applied for within 30 days from this date; (4) the amount of insurance effective hereunder, together with any other insurance in force with the Company on the life of the proposed insured shall not exceed $50,000 through age 60; (5) check or draft is honored and no erasures or alterations have been made on this form.

The company required a medical examination, so the date of the medical examination rather than that of the application would be the effective date of the insurance.

The applicant submitted to a medical examination on September 22, 1960, by the

company doctor. This doctor approved the applicant for insurance. Because the defendant company had some information to the effect that the applicant had been rejected for military service, it required a second examination by another doctor, which examination was completed September 27, 1960. This doctor likewise approved the applicant for insurance. However, there was an inconsistency in the statements made to the two medical examiners by the applicant. In the first examination he answered "Yes" and in the second examination he answered "No" to this question: "4E. Have you ever been X-rayed for diagnostic purposes or for treatment of disease?" There was also an inconsistency in the answers given to the question "Has there been any suspicion of, or have you ever had or been treated for any of the following diseases or ailments: 6D. Palpitation of heart, shortness of breath, pain in chest, abnormal pulse, any disease of the heart or blood vessels or high blood pressure?" To the first doctor he answered "Yes," and to the second doctor he answered "No."

He explained in detail in all of the papers that he was requesting insurance in the amount of $100,000 to replace three policies which he was carrying in the total amount of $80,000. The company was advised that he had a herniorrhaphy in 1955 when in the air force; that he had rheumatic fever at age twelve but that recent EKG's were all negative; that he spent ten days in bed in 1936 with rheumatic fever and had a murmur in his heart which persisted until 1945 but that no one had heard one since.

At the first examination the company doctor found a heart murmur (systolic) after exercise. At the second examination the doctor wrote in the place provided for "Murmur present? Systolic" the figure 118.

On October 19, 1960, the defendant requested its agent to secure from Doctor Prince "an afternoon heart chart, an electrocardiogram, and chest x-ray." By November 10, 1960, the defendant had received the chest X-ray and the electrocardiogram. On November 11, 1960, defendant again requested its agent to secure the afternoon heart chart. On December 14, 1960, the defendant sent a third heart chart to its agent and requested that he make arrangements to have the chart completed on Doctor Prince.

The parties stipulated to the facts of this case, one of which is that two appointments were made for the afternoon heart chart but that the company doctor cancelled one because of an emergency which he had with his clients, and the applicant cancelled the other because of some emergency of his own.

On the 19th day of December, 1960, Robert Alpine Prince was killed when he accidentally came in contact with some exposed

wiring in an office building he was constructing.

After the death of the applicant, the defendant tendered back the premium paid; and the plaintiff as beneficiary on the application sued for $100,000, the amount of insurance applied for.

The trial court found for the defendant on stipulated facts, and plaintiff has perfected this appeal.

■ We do not accord to the trial judge any advantage in this case because he based his findings on stipulated facts and he is not entitled to the advantage which goes with seeing and hearing witnesses testify. Therefore, we need not sustain him unless we are convinced of the correctness of his holding.

■ Originally, binding receipts were issued because they assisted the insurance company to keep a favorable contact with the applicant. If the company got no money from the applicant, he might refuse to take the policy after the company had gone to the expense of having a medical examination. If money was paid by the applicant, he could demand it back before the company had decided to pass him for insurance. By issuing a binding receipt, the insurance company could either cover the applicant with insurance pending the investigation or could make him think he was covered so that he would not demand his money back.

The language of the binding receipt is generally so devised that it is an attempt on the part of the company not to bind itself to pay any money in case of death of the applicant before there is a policy issued or at least until the company has decided to issue a policy. If the applicant dies in the meantime, the company loses nothing. If the applicant lives, the company has received a premium for the period that has elapsed since the purported effective date of the binding receipt.

Courts have generally read into such binding receipt agreements an obligation on the part of the company to pay when the loss occurred before the issuance of the policy if, except for the loss, the company would have issued the policy. In doing so, courts have not departed from the regular rules of construction of an ordinary contract.

■ In the interpretation of binding receipts, the intention of the parties should be the controlling factor. This intention is the mutual intention of the parties and not the intention of only one of them, unless the other party was aware of the intention and understanding of the one and allowed him to contract without advising him of another interpretation. See Corbin on Contracts, § 537, where in it is said:

* * * If, in the case above, A knew or had reason to know the meaning that B in fact gave to A's promissory words, then the substantive law declares that B's understanding shall be given legal effect. This rule we can lay down before we

know just what B's understanding was; but before determining legal effects the court must discover what his meaning was and whether A knew or had reason to know that he gave it.

A further statement in § 107 of Corbin on Contracts seems apropos here:

In modern business life there are innumerable "standardized" contract forms, such as are found in insurance, transportation, sales of goods, and distribution agencies, prepared by one party for his recurrent use in many transactions. They may contain many provisions, often in fine print, the purpose of which is to limit his own obligations and to avoid risks that he would otherwise have to bear. He may present this to the other party, often much less well informed or advised, on the basis of "accept this or get nothing," well knowing that the other party does not know or understand. In these cases, the requirement of an actual "meeting of the minds" may well be made effective against the party in the superior position. Even if the other party knew and understood, provisions have sometimes been refused enforcement as "unconscionable."

We, therefore, should look carefully to the situation which confronts us here.

Doctor Prince made application for a policy with defendant company to replace some $80,000 of insurance with other companies on his own life. The binding receipt provided that his insurance would take effect on the date of the medical examination if the first full premium was prepaid and the policy issued as applied for within 30 days. The 30-day period was to enable the company to decide if he was an insurable risk. The applicant would have no control over the amount of time which the company would need to make that determination. If more than 30 days was required, he would have no objection if he was covered from the date of his medical examination.

There is an ambiguity as to what is meant by the date of medical examination as stated on the back of the binding receipt. The Supreme Court of Texas determined that matter in the case of United Founders Life Insurance Company v. Carey, 363 S.W.2d 236, at page 242, wherein it said:

Assuming, then, that the receipt does provide temporary insurance for some period of time, we are confronted with the question of when it becomes effective. It is on this question that the receipt is particularly ambiguous. It provides that the insurance is to be effective on the date of the "receipt or the date of *completion of medical examination* (if required) whichever is the later date." What is meant by *completion of medical examination?* Does it mean completion of the medical examination by the doctor to whom the applicant is referred? Or

does it mean completion of that examination and any further *investigation* the insurer decides to make of an applicant's medical history? Resolving the doubt against petitioner, we think it means the former.

■ We think that the binding receipt became effective upon completion of the medical examination by the company doctor on September 22, 1960, unless at that time the applicant was not an insurable risk.

In requiring further examinations, the defendant did not appear to be rejecting the application of Doctor Prince, but it appeared to be attempting to figure the best rate it could give to the applicant as is indicated by plaintiff's Exhibit 5, a letter dated October 19, 1960, to the insurance agent, wherein the defendant stated: "In order for us to make our best offer on Dr. Robert Alpine Prince, we will need an afternoon heart chart (this form is enclosed), an electrocardiogram and chest x-ray."

During the lifetime of applicant no notice of rejection was ever given to him, and no return of the premium paid was ever offered. The applicant had no intimation that he was not insured or that he should act so as to prevent his $80,000 worth of life insurance from lapsing.

The fact that the defendant knew the applicant was depending upon the company to replace such a large sum of insurance indicates that the company represented to the applicant that it did not intend to leave him uninsured, and it seems rather unrealistic to think that the parties intended for the binding receipt to cover applicant for only thirty days and not to insure him thereafter in case the company decided to make some further investigation relative to the best rate to be given the applicant.

A majority of the states have held that there is no coverage under a binding receipt until there has been an approval of the application. See Annotation in 2 A.L.R. 2d at 964. However, the same Annotation at page 967 says that in a number of cases, mostly of more recent origin, it has been held that a binding receipt stating that the insurance shall be in force and effect from a certain date provided the application is approved and accepted at the home office is effective in providing protection to the applicant until the application is approved on the ground of an assumed intention of the parties to this effect. See Decennial Digests, Insurance, ☞ 132(2). A statement of the trend of the more recent decisions is found in 29 Am.Jur., Insurance, § 210:

A more liberal provision than the one which makes the effectiveness of the temporary insurance dependent on the approval of the application by the home office of the insurance company is the provision to the effect that the effectiveness of the temporary insurance shall be conditioned on the insurability of the

applicant at the time of the application or the medical examination. Where a binding receipt is issued to the applicant with a provision that the insurance be binding from the date of the application or the medical examination if the insurance company is satisfied that the applicant was an insurable risk at that time, the general rule is that a contract of preliminary insurance is created with the reserved right in the insurer to determine in good faith the applicant's insurability. Hence if, at the time of the application or medical examination, the insured was an insurable risk, the temporary contract of insurance is in force, If, however, the applicant at the time of the application or the medical examination was not an insurable risk, the company will not be liable under the "binding receipt." The rationale behind this holding is simply that the language of the receipt clearly expresses the intention of the parties.

See also 44 C.J.S. Insurance § 230(3).

In 1954 the Supreme Court of California had a situation very similar to the instant case entitled Ransom v. The Penn Mutual Life Insurance Company, 43 Cal.2d 420, 274 P.2d 633. In that case the applicant made a written application and paid the first premium in full. In the application he stated that he had previously been examined by Doctor Long; and when the insurance company made inquiry of Doctor Long, he reported that the applicant had complained of a heavy feeling in the chest. After receiving Doctor Long's report, the defendant insurance company requested the applicant to submit to a further medical examination, but before this could be arranged applicant was killed in an automobile accident. The company then tendered the premium paid to the widow of the applicant, and she brought suit on the policy. The application contained the following statement:

If the first premium is paid in full in exchange for the attached receipt signed by the Company's agent when this application is signed the insurance shall be in force, subject to the terms and conditions of the policy applied for, from the date of Part I or Part II of this application, whichever is the later, provided the Company shall be satisfied that the Proposed Insured was at that date acceptable under the Company's rules for insurance upon the plan at the rate of premium and for the amount applied for, but that if such first premium is not so paid or if the Company is not satisfied as to such acceptability, no insurance shall be in force until both the first premium is paid in full and the policy is delivered while the health, habits, occupation and other facts relating to the Proposed Insured are the same as described in Part I and Part II of this application and in any amendments thereto.

The California court then discussed the holdings of the various courts and an-

nounced that the law in California was to the effect that a contract of insurance arose upon the defendant's receipt of the completed application and the first premium payment. At page 636 of the Pacific Reporter it used the following language:

The understanding of an ordinary person is the standard which must be used in construing the contract, and such a person upon reading the application would believe that he would secure the benefit of immediate coverage by paying the premium in advance of delivery of the policy. There is an obvious advantage to the company in obtaining payment of the premium when the application is made, and it would be unconscionable to permit the company, after using language to induce payment of the premium at that time, to escape the obligation which an ordinary applicant would reasonably believe had been undertaken by the insurer.

The defendant cites the case of Green v. Equitable Life Assurance Society of United States, 3 Utah 2d 375, 284 P.2d 695, as being controlling in the instant case.

In that case Delbert O. Green, the husband of plaintiff, made application for a policy of insurance in connection with a loan on his home. On the same day and concurrently with the application he executed what is called a temporary agreement, agreeing to pay $29.07, the first monthly payment, plus $9.36 on account of

the premium on the preliminary term of insurance. A receipt detached from the application and given to the applicant provided:

Received of _____ No. 747545 _____ dollars, to cover _____ on proposed insurance for $_____ on the life of _____ for which Part I of an application bearing a corresponding number as above is this day made to The Equitable Life Assurance Society of the United States. Insurance, subject to the terms and conditions of the policy contract, shall take effect as of the date of this receipt, provided satisfactory Part II of the application is furnished to the Society and provided the person whose life is proposed for insurance is on this date, in the opinion of the Society's authorized officers in New York, an insurable risk under under its rules and the application is otherwise acceptable on the plan and for the amount and at the rate of premium applied for; otherwise the payment evidenced by this receipt shall be returned on demand and upon the surrender of this receipt.

Dated at _____, _____ 19____, _____, Agent.

On December 2, 1952, the applicant was notified that the mortgage loan portion of his application had been tentatively approved, subject to insurability and satis-

factory credit. On December 22 the medical officer of the defendant gave Delbert O. Green a medical rating which signified that his application was not approved. Green died on December 28, 1952, and his widow, the proposed beneficiary, brought an action to recover on what she claimed to be the temporary policy of insurance. The trial court, after hearing the evidence, found for the defendant, and this court affirmed the trial court

The instant case differs from the Green case in several respects. In the first place, in the Green case this court was required to sustain the trial court if there was any competent evidence upon which the findings of the intention of the parties could be based. Here there was no testimony given, and we are not required to affirm the court unless we ourselves are convinced of the correctness of the position. In the second place, the plaintiff Green sued not on the binding receipt but on a preliminary contract of insurance for which applicant paid $9.36 over and above the regular monthly payments on the policy. In the third place, Delbert O. Green was not replacing insurance on his life. In the fourth place, Green was not an insurable risk. In the instant case Doctor Prince was an insurable risk as is evidenced by the fact that two doctors who examined him found him to be so and by the further fact that on October 19, 1960, about four weeks after the first medical examination, the company considered him to be insurable when it wrote the letter to its agent stating, "In order for us to make our best offer on Dr. Robert Alpine Prince, we will need an afternoon heart chart, an electrocardiogram and chest x-ray."

For the above reasons we do not think the Green case is controlling because it is not in point under a fact situation which confronts us in the instant matter.

It will be noted that the premium to be paid by Doctor Prince amounted to over $200 per month. This means that over $400 of the first year's premium had been eaten up by expiration of time before his death occurred. It should also be noted that while awaiting the issuance of the policy, Doctor Prince was insured in an amount of not exceeding $50,000, which was only half of the amount of the policy applied for. It is evident to us that the lower court was in error in ruling for the defendant. The judgment is reversed with directions for the trial court to enter judgment for the appellant in the amount of $50,000 together with interest from the date of death of Robert Alpine Prince. Costs awarded to the appellant.

CROCKETT, C. J., and CALLISTER, and TUCKETT, JJ., concur.

HENRIOD, J., concurs in the result.