507 P.2d 381

Russell G. HOLLEY, Plaintiff and Respondent,

v.

FEDERAL–AMERICAN PARTNERS et al., Defendants and Appellants.

No. 12927.

Supreme Court of Utah.

March 2, 1973.

Leonard J. Lewis, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for defendants-appellants.

John W. Horsley, of Moyle & Draper, Salt Lake City, for plaintiff-respondent.

CROCKETT, Justice:

Russell Holley, owner of a one-tenth interest in the royalties from certain uranium mining claims in Fremont County, Wyoming, sued Federal-American Partners, his lessee, seeking a favorable construction of language in their mining lease and an accounting on what is termed an "annual" method of accounting in computing "net receipts" from the mining operation, as opposed to the defendants' contention that it should be either on a "cumulative" or on an "allocation" method. Upon a plenary trial the court found in favor of the plaintiff and entered judgment thereon. Defendants appeal.

The terms of the lease pertinent to this controversy provide that each year the defendants will submit to the plaintiffs a report and accounting of the mining operations, from which the plaintiff may elect to receive his one-tenth interest in the royalty on one of two bases. We state this as summarized in defendants' brief:

Lessee shall pay to the Lessors the royalty hereinafter provided:

a. Ten per cent (10%) of "Gross Receipts"; or

b. Fifty per cent (50%) of "Net Receipts" on all sales less three per cent (3%) of "Gross Receipts."

For the years 1963 through 1967 defendants supplied to plaintiff an accounting of gross and net receipts, but computed net receipts by using two separate methods of accounting: an "annual method" which is summarized in plaintiff's brief:

The method is to deduct from the gross receipts of the year the allowable costs for that year, being all costs actually incurred during the year and certain other special deductible items for which the Lease prescribes specific treatment (the deductions for equipment depreciation tools, a 6% interest allowance on lessee's equipment investment, and a 5% overhead expense factor);

and also by what is termed a "cumulative method" which is based upon the accumulation of figures since the beginning of the project or, in other words, total revenues less total costs since the commencement of mining operation to the end of the accounting year.

The controversy involved here arose because, though in prior years the plaintiff had chosen to take his compensation under paragraph (a), on the basis of 10% of the "gross receipts," for the year 1966, he changed, and chose to take under paragraph (b) quoted above, on the basis of 50% of the "net receipts on all sales less three per cent (3%) of gross receipts." In making this choice, the plaintiff's position adopted by the trial court, was that he was entitled to his royalty based on the "annual

method" of accounting as hereinabove stated. In support thereof he points to the provisions in paragraph 7 of the lease which states:

> [T]he term net receipts . . . shall be construed to mean the sum remaining after the deduction from gross receipts all field costs plus five per cent (5%) of said field costs to be allowed for overhead;

and of paragraph 9 which states:

> [A]n annual computation of the gross and net receipts . . . shall be made at such time as shall conform to the income tax year of Lessee.

He argues that this reference to the "annual" computation of the net receipts, correlated to "the income tax year," indicates that the accounting should be limited to the particular year covered, and thus exclude any idea of the "cumulative method" over a period of years.

Defendants argue that the method contended for by the plaintiff and adopted by the trial court results in an unfair and inequitable contract to them; and they rely on the testimony of an expert witness to the effect that the accounting practices in the extractive mining industry require either the cumulative method stated above,

or an "allocation method" under which all costs are averaged over the mining properties' life to an average cost per ton and are allocated to the lease year in question and deducted in proportion to the tonnage produced.

In regard to those contentions these observations are applicable: Just how the parties fare under the contract is not the concern of the courts, but in the absence of some unconscionability, it should be enforced according to the meaning of its terms as intended by the parties insofar as that can be ascertained.[1] However, we remark aside, that from the determination made by the trial court, it does not appear that he thought the equities were against the defendants. Plaintiff is not chargeable with the drafting of this lease because it was drafted by attorneys representing the defendants' side of this controversy. The trial court was therefore justified in resolving any uncertainty in the plaintiff's favor.[2] He was not bound to accept the testimony of the defendants' expert as to accounting methods known to and practiced by accountants in the mining industry as necessarily imposed upon the plaintiff. This is particularly so because it appears that plaintiff was not experienced and well informed in that field. The court

---

1. Jones v. Acme Bldg. Products, Inc., 22 Utah 2d 202, 450 P.2d 743; Ephraim Theatre Co. v. Hawk, 7 Utah 2d 163, 321 P.2d 221.

2. Ibid.

was free to judge both the credibility of that testimony, and the persuasive influence it had upon him in the light of all of the other evidence in the case.[3]

■ Moreover, it seems quite within the limits of reason for the trial court, consistent with his prerogative of applying the meaning which persons of ordinary intelligence could understand from the provisions of the contract,[4] to determine as he did, that the covenant to the plaintiff that he could receive "ten per cent of the net receipts" meant on the basis of an accounting for the particular year of the gross amount received, minus the amount paid out, to be the "net receipts" he was to receive; and further, that if the defendants had intended the refinements they now contend for in the "cumulative" or "allocation" methods of accounting of long term costs, they could and should have so stated in the contract.[5]

■ In the light of our recognition of the prerogatives of the trial court, and of the presumptions which favor the validity of the judgment,[6] we are not persuaded that the defendants have sustained the burden which is theirs of demonstrating that the determination made and the judgment entered by the trial court should be upset.[7]

Affirmed. Costs to plaintiff (respondent).

CALLISTER, C. J., and HENRIOD and TUCKETT, JJ., concur.

ELLETT, Justice (dissenting):

I dissent.

This case involves an accounting procedure in strip mining. The cost of removing overburden to expose ore is incurred in one year, and as a result ore can be removed for several years thereafter without additional expense of removing overburden. The trial court held that the cost of

3. Am. States Inc., etc. v. Walker et al., 26 Utah 2d 161, 486 P.2d 1042.

4. Equitable Life Assur. Soc. v. Gillam, 195 Ga. 797, 25 S.E.2d 686; Auto Lease Co. v. Central Mutual Ins. Co., 7 Utah 2d 336, 325 P.2d 264; Prince v. Western Empire Life Ins. Co., 19 Utah 2d 174, 428 P.2d 163.

5. Defendants cite Rimledge Uranium & Mining Corp. v. Federal Resources Corp., 13 Utah 2d 329, 374 P.2d 20 (1962); and Richardson v. Homestake Mining Co., 322 F.2d 329 (10th Cir. 1963), as supportive of their contention as to the proper method of accounting. We do not

regard those cases as inconsistent with this one. The issue there was whether or not certain deductions were permitted in computing "gross value" or "gross proceeds" whereas here our concern is as to the "net receipts," which we resolve on the basis of the terms of the contract as determined by the trial court.

6. Schlueter v. Summit County et al., 25 Utah 2d 257, 480 P.2d 140, and authorities cited therein.

7. See Citizens Casualty Co. of New York v. Hackett, 17 Utah 2d 304, 410 P.2d 767.

removing the overburden was to be charged to the year when it was incurred and not prorated over the life of the exposed ore body. I think he erred in doing so. He did not follow the evidence of the expert accountant, who testified that in the strip mining industry it is generally accepted that such costs will be capitalized and allocated to the ore produced in each year based upon the probable ore reserves in place.

If the defendants had bought the mine with the overburden already removed, the situation would be the same as if they had bought the mine with overburden on top of the ore and then expended a large sum of money to remove the waste matter. In either case there is no loss for the year when payment was made or overburden removed solely because of the expenditure. The gross sales in succeeding years would not be the measure of profits.

The main opinion in affirming the trial court speaks of gross receipts and net receipts as if they refer to cash receipts. Since the amount of cash received in any given year is a fixed sum, there cannot be two figures for it, viz., *gross* and *net*. The meaning is obviously gross profit and net profit.

In this case the plaintiff was given the option to take 10% of the gross profit or 50% of the net profit each year. His contention is that he can take either 10% of the gross receipts [1] or 50% of the net receipts. The trial court allowed him to take 10% of the gross in the year of removing the overburden and 50% of the net thereafter.

A simple example will show the fallacy of such a method:

Suppose a shoe store sells 100 pairs of shoes per day at a price of $10 per pair. If the shoes cost $6 per pair, the profit would be $4 per pair (excluding overhead, etc.). Now, if the salesman can have 10% of the gross receipts or 50% of the net, he would really have a good deal. Suppose the merchant bought 600 pairs of shoes on Monday and paid therefor $3600. The salesman would take 10% of the gross sales for that day and get $100. On each of the other five days he would claim 50% of the net take, and since there is no cost of shoes on these days, he would claim $500 per day. His wages for the week would then be $2600, although it is perfectly obvious that the total profit on the sales is only $2400.

I think the lower court erred in its interpretation of the agreement, and I would reverse the judgment and award costs to the appellants.

1. Minus certain prescribed costs but excluding anything for overburden except in the year when actually paid out.