Claude L. **HEINER** and Dan H. Hunter, Plaintiffs and Appellants,

v.

S.J. **GROVES & SONS COMPANY**, a Minnesota corporation; and Western States Mineral Corporation, a Utah corporation, Defendants and Respondents.

No. 880204–CA.

Court of Appeals of Utah.

March 30, 1990.

Reed L. Martineau and Stephen J. Hill (argued), Snow, Christensen & Martineau, Salt Lake City, for plaintiffs and appellants.

David Isom (argued) and Scott F. Young, Davis, Graham & Stubbs, Salt Lake City, for defendants and respondents.

Before BILLINGS, GARFF, and ORME, JJ.

## OPINION

BILLINGS, Judge:

Appellants Claude L. Heiner and Dan H. Hunter ("Heiner and Hunter") filed a complaint for breach of a mining contract against respondent S.J. Groves & Sons Company ("Groves"). The trial court dismissed the complaint with prejudice for failure to state a claim upon which relief could be granted. Heiner and Hunter appeal. We affirm.

James Dickert and Robert Eddy ("Dickert and Eddy") held five coal leases on the Dog Valley Coal Mine ("Dog Valley Coal Leases"), located in Emery County, Utah. On May 28, 1975, Dickert and Eddy entered into an Option to Purchase and Purchase Agreement ("1975 Dickert Agreement") with Heiner and Hunter, whereby Dickert and Eddy agreed to assign the Dog Valley Coal Leases to Heiner and Hunter. Heiner and Hunter paid $10,000 for an option on the Dog Valley Coal Leases, then paid $20,-000 for the purchase of the Dog Valley Coal Leases and for certain equipment. Heiner and Hunter also agreed to pay Dickert and Eddy an overriding royalty on all merchantable coal mined and sold.

Under the 1975 Dickert Agreement, Heiner and Hunter agreed to mine coal unless (1) mining became unprofitable; (2) mining was precluded by an event beyond Heiner and Hunter's control; or (3) Heiner and Hunter voluntarily decided to terminate their interest in the Dog Valley Coal Leases. In the event Heiner and Hunter voluntarily decided to terminate their interest, they agreed to reassign the Dog Valley Coal Leases to Dickert and Eddy. Finally, both parties to the agreement agreed that any successors or assigns would be bound by the terms of the 1975 Dickert Agreement.

On March 1, 1976, Heiner and Hunter entered into a Purchase Agreement ("1976

Groves Agreement")[1] with Groves, whereby Heiner and Hunter agreed to assign the Dog Valley Coal Leases, to transfer other property interests not included in the 1975 Dickert Agreement, and to sell certain equipment to Groves, and Groves agreed to pay $2,000,000 to Heiner and Hunter. Under the 1976 Groves Agreement, Groves assumed the obligations of Heiner and Hunter to Dickert and Eddy under the 1975 Dickert Agreement and, in addition, Groves was required to pay Heiner and Hunter an overriding royalty on coal mined from the Dog Valley Coal Mine. Heiner and Hunter also executed an Assignment and Bill of Sale agreement and the appropriate State of Utah assignment forms to reflect the transfer of the Dog Valley Coal Leases.

The 1976 Groves Agreement referred to the 1975 Dickert Agreement, stating:

> 7.10.... Buyer [Groves] will from and after the Closing perform and pay as and when due all obligations required under [the 1975 Dickert Agreement]. Buyer shall indemnify and hold harmless Sellers [Heiner and Hunter] from any and all claims, suits and liabilities relating thereto arising from acts or defaults of Buyer from and after the Closing; and Sellers shall indemnify and hold Buyer harmless from any and all claims, suits and liabilities relating thereto arising from acts or defaults of Sellers prior to the Closing.

Groves mined coal at the Dog Valley Mine from 1976 until 1981. On October 1, 1981, after ceasing mining operations, Groves entered into an agreement with Dickert and Eddy entitled Amendment to Option to Purchase and Purchase Agreement ("1981 Dickert Agreement"). The 1981 Dickert Agreement eliminated the obligation to continue to mine coal included in the 1975 Dickert Agreement, which Groves had assumed under the 1976 Groves Agreement. The 1981 Dickert Agreement included, however, the requirement that Groves would pay Dickert and Eddy a minimum royalty of $3,000 per month. The 1981 Dickert Agreement further stated that Groves' obligation to make the minimum monthly royalty payments would terminate upon reassignment of the Dog Valley Coal Leases to Dickert and Eddy.

From 1981 to 1985, Groves made no overriding royalty payments to Heiner and Hunter as it had ceased mining coal. In 1985, Groves reassigned all of its interest in the Dog Valley Coal Leases to Dickert and Eddy.

On January 9, 1987, Heiner and Hunter filed a complaint against Groves contending that, under the 1976 Groves Agreement, Groves was obligated to mine coal and that Groves had breached that obligation. The trial court dismissed the complaint for failure to state a claim. Heiner and Hunter appeal, claiming that (1) Groves owed Heiner and Hunter an independent obligation to mine coal under the 1976 Groves Agreement; (2) Groves could not extinguish its obligation to mine coal by entering into the 1981 Dickert Agreement; and (3) Groves violated its duty of good faith and fair dealing by failing to protect Heiner and Hunter's overriding royalty interest.

## STANDARD OF REVIEW

When we review a judgment entered on a motion to dismiss pursuant to Rule 12(b)(6) of the Utah Rules of Civil Procedure, "we are obliged to construe the complaint in the light most favorable to the plaintiff and to indulge all reasonable inferences in its favor." *Arrow Indus. v. Zions First Nat'l Bank*, 767 P.2d 935, 936 (Utah 1988); *see also Penrod v. Nu Creation Creme, Inc.*, 669 P.2d 873, 875 (Utah 1983); *Mounteer v. Utah Power & Light Co.*, 773 P.2d 405, 406 (Utah Ct.App.1989). A motion to dismiss will be affirmed only "where it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of its claims." *Arrow*, 767 P.2d at 936; *see also Freegard v. First*

---

1. The contracts in the record on appeal reflect intervening transfers of the interests of the parties. However, the parties agree that these transfers are not relevant to the claims on appeal. Therefore, we use the names of the parties, regardless of the intervening successors in interest.

*W. Nat'l Bank,* 738 P.2d 614, 616 (Utah 1987); *Mounteer,* 773 P.2d at 406.

## GROVES' CONTRACTUAL OBLIGATIONS

### A. *The 1976 Groves Agreement*

Heiner and Hunter claim Groves assumed a continuing obligation to them to mine coal under the 1976 Groves Agreement. They therefore claim Groves breached its duty when it ceased mining operations, thus failing to pay overriding royalty payments to them under the 1976 Groves Agreement. Groves, on the other hand, contends that it assumed no duty to mine coal running in favor of Heiner and Hunter in the 1976 Groves Agreement. We focus on the 1976 Groves Agreement to resolve this dispute.

■ The general principles governing the interpretation of contracts apply to documents conveying mineral interests. *Miller v. Schwartz,* 354 N.W.2d 685, 688 (N.D. 1984). "The cardinal rule is to give effect to the intentions of the parties and, if possible, to glean those intentions from the contract itself." *LDS Hosp. v. Capitol Life Ins. Co.,* 765 P.2d 857, 858 (Utah 1988); *G.G.A., Inc. v. Leventis,* 773 P.2d 841, 845 (Utah Ct.App.1989).

In addition, we interpret a contract "so as to harmonize all of its terms and provisions, and all of its terms should be given effect if possible." *G.G.A., Inc.,* 773 P.2d at 845; *Buehner Block Co. v. UWC Assocs.,* 752 P.2d 892, 895 (Utah 1988).

However, we will not rewrite an agreement to relieve a party from a bad bargain.

> It is a long-standing rule in Utah that persons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts to relieve either party from the effects of a bad bargain. This Court will not rewrite a contract to supply terms which the parties omitted.

*Hal Taylor Assocs. v. Unionamerica, Inc.,* 657 P.2d 743, 749 (Utah 1982) (citations omitted). *See also Holley v. Federal–American Partners,* 29 Utah 2d 212, 507 P.2d 381, 383 (1973); *Crowther v. Carter,*

767 P.2d 129, 132 (Utah Ct.App.1989); *Barker v. Francis,* 741 P.2d 548, 553 (Utah Ct.App.1987).

■ We apply these principles to determine if Groves assumed a duty to mine coal running in favor of Heiner and Hunter under the 1976 Groves Agreement. Under their 1975 Dickert Agreement with Dickert and Eddy, Heiner and Hunter agreed to mine coal. The specific provision stated:

> Buyers [Heiner and Hunter] hereby agree that from and after the transfer to them of said leases they will enter onto the subject lands and commence mining operations for coal with reasonable dispatch and to continue such mining operations with reasonable diligence until all of the reasonably mineable and merchantable coal on, in and under the subject land has been mined, removed and sold. Merchantable coal shall include only that coal that can be mined, removed and sold at a reasonable profit. In the event of the occurrence of an event or events beyond the reasonable control of the Buyers then Buyers shall be excused from performing the obligations imposed upon them under this paragraph during the continuation of such event and to the extent made reasonably necessary by such event.

The 1975 Dickert Agreement further stated:

> In the event Buyers shall voluntarily decide to terminate their interest under any of said leases or in the event of the default of Buyers or their assignees under any of said leases which default shall remain uncorrected after thirty (30) days' actual notice of such default, Sellers [Dickert and Eddy] shall be entitled to the reassignment of the leases and Buyers agree to use their best efforts to secure the approval or consent of the Utah State Land Board to such reassignment. . . .

In the 1976 Groves Agreement, Groves assumed the obligations Heiner and Hunter owed to Dickert and Eddy under the 1975 Dickert Agreement. Paragraph 7.10 in the 1976 Groves Agreement reflects that obligation:

Buyer [Groves] will from and after the Closing perform and pay as and when due all obligations required under [the 1975 Dickert Agreement]. Buyer shall indemnify and hold harmless Sellers [Heiner and Hunter] from any and all claims, suits and liabilities relating thereto arising from acts or defaults of Buyer from and after the Closing; and Sellers shall indemnify and hold Buyer harmless from any and all claims, suits and liabilities relating thereto arising from acts or defaults of Sellers prior to the Closing.

Heiner and Hunter contend that this language reflects an assumption of an obligation to mine coal running in their favor.

The trial court concluded that Groves owed Heiner and Hunter no independent obligation to mine coal:

By such a provision [Paragraph 7.10], it is obvious that defendants [Groves] were required, and became obligated to Dickert and Eddy to enter onto the subject land and commence mining operations and to continue such mining operations as long as it could be done profitably. This obligation was one owed to Dickert and Eddy and was not restated as an obligation to [Heiner and Hunter] in the [1976 Groves] Agreement.

The Complaint alleges that the defendants satisfied this obligation to mine with Dickert and Eddy by entering into a separate agreement with them and paying them a cash consideration.

The plaintiffs [Heiner and Hunter] are alleging a duty on the part of the defendants to perform mining that is not owed to them and which does not exist and is not set forth in either of the Agreements relied upon. The Agreements clearly state that the defendants owed a duty to mine to Dickert and Eddy, and owed a duty to the plaintiffs to pay a royalty on all coal mined and produced by them. The defendants, as stated in the Com-

plaint, have satisfied the obligation to Dickert and Eddy and have ceased mining and have produced and sold no coal so that no royalty is owing.

We agree with the trial court that the 1976 Groves Agreement did not create any independent obligation to Heiner and Hunter to mine coal, but merely provided that Groves assumed Heiner and Hunter's obligation to Dickert and Eddy to mine coal under the 1975 Dickert Agreement. If the parties to the 1976 Groves Agreement had intended to create a continuing obligation to mine running in favor of Heiner and Hunter, a provision describing this key right could have readily been incorporated into the 1976 Groves Agreement. The parties had the 1975 Dickert Agreement before them and could have adopted its language to create an independent duty to mine coal running in favor of Heiner and Hunter. We will not add a term that Heiner and Hunter now wish had been included. See Hal Taylor Assocs., 657 P.2d at 749.

Heiner and Hunter received what they bargained for in the 1976 Groves Agreement—a $2,000,000 cash payment for the transfer of the Dog Valley Coal Leases, other property rights and an overriding royalty if coal were mined. Their contract did not provide for a continuing obligation to mine coal and, thus, a continuing overriding royalty.

B. *The 1981 Dickert Agreement*

Next, Heiner and Hunter challenge Groves' elimination of its duty to mine coal by the 1981 Dickert Agreement with Dickert and Eddy. Heiner and Hunter argue that the 1976 Groves Agreement did not constitute an assignment of their rights and a delegation of their obligations under the 1975 Dickert Agreement to Groves, but was simply a sublease [2] of the Dog Valley Coal Leases, other property rights and equipment.[3] Thus, Heiner and Hunter

---

2. While Heiner and Hunter argue that the transfer was a "subpurchase" because a sale took place, they analogize this transfer to a "sublease" when discussing the assignment-sublease distinction.

3. The result of the distinction is described in one article:

In the case of an assignment, privity of estate exists between the lessor and the assignee, thereby making the benefits and burdens of those covenants which run with the land enforceable directly by the lessor or assignee

claim that since there was neither privity of contract, nor privity of estate between Dickert and Eddy and Groves, Groves could not modify the 1975 Dickert Agreement to terminate its duty to mine coal.[4]

Heiner and Hunter claim the 1976 Groves Agreement should be construed as a sublease rather than an assignment, primarily because Heiner and Hunter reserved an overriding royalty when assigning the Dog Valley Coal Leases.[5] We review the law concerning the distinction between an assignment and a sublease to answer Heiner and Hunter's claim.

■ Utah law does not require that special language be used to constitute an assignment:

> Technical terms or special words are not necessary to an assignment. Any language which shows the intention of the parties to transfer the property from one to the other is sufficient, the form of the instrument being immaterial. If it has the legal effect to pass to another the lessee's interest in the whole or in any part of the demised premises for his entire term, or the remainder of his term, it is an assignment.

*Jensen v. O.K. Inv. Corp.*, 29 Utah 2d 231, 507 P.2d 713, 716 (1973) (quoting 3A *Thompson on Real Property* § 1210 (1959 Replacement)).

■ In the area of real property, Utah courts have focused on whether the lessee-transferor transferred his entire interest in the estate to determine whether an assignment has occurred. If the entire interest passes, it is an assignment. If not, it is a sublease.

The formal character of the paper or the designation given the transaction in the contract is not important in determining whether an instrument is a sublease or an assignment. *When the lessee's entire estate passes the instrument is an assignment, though words of demise are used, and rent and a right of reentry for nonpayment are reserved, or even though it is called a sublease....* The test is whether the grant leaves a reversionary interest in the original lessee or operates to transfer his entire term....

A sublease for the whole term is in law an assignment as between the original lessor and the sublessee,....

507 P.2d at 716 (emphasis added) (quoting 3A *Thompson on Real Property* § 1210 (1959 Replacement)). *See also L & M Corp. v. Loader*, 688 P.2d 448, 449 (Utah 1984) ("A sublease is a transfer of something less than the tenant's full interest, but the transfer of the tenant's entire term constitutes an assignment.").

Utah courts have not considered the distinction between an assignment and a sublease in the mining or oil and gas area, nor the impact of a reservation of an overriding

---

against the other party.... In the case of a sublease, the lessee/sublessor retains some interest under the original lease, thereby preventing the establishment of privity of estate between the lessor and sublessee. Because of this lack of privity of estate and because privity of contract exists only between the lessor and lessee and between the lessee/sublessor and sublessee, the lessor and sublessee are deemed to be legal strangers and each has no rights or duties enforceable against the other. Sager & Henderson, *Assignment Provisions in Mining Agreements*, 27A Rocky Mtn. Min. L. Inst. 887, 902–03 (1982).

4. Heiner and Hunter also seem to argue that the obligation to continue to mine coal was delegated to Groves even though the qualifications of those obligations found in the 1975 Dickert Agreement, such as the ability to reassign the Dog Valley Coal Leases to Dickert and Eddy so as to terminate this obligation, did not survive

the transfer. We find this argument without merit.

5. Heiner and Hunter also point to the termination clause in the 1976 Groves Agreement as evidence that the agreement was a subpurchase rather than an assignment as it differed from the termination clause in the 1975 Dickert Agreement. The 1976 Groves Agreement states: "If Sellers [Heiner and Hunter] elect to terminate pursuant to 9.1(ii) [default of Groves not cured within 30 days], the (a) Sellers shall be released from all obligations under this Agreement; and (b) Sellers shall have the right to damages as provided in law for loss of their bargain by reason of the default of Buyer [Groves]." This provision does not change Groves' obligations to Dickert and Eddy under the 1975 Dickert Agreement and, thus, we cannot see why it is evidence that the parties intended a subpurchase rather than an assignment.

royalty.[6] Mining, oil and gas agreements are unique. Courts from other jurisdictions have not developed a consistent approach to determining whether an assignment or a sublease exists where a transfer of an interest in an oil and gas or mineral lease occurs. Courts have relied on the areas of contract law, property law, landlord-tenant law, oil and gas law and vendor-purchaser law with differing results. Sager & Henderson, *Assignment Provisions in Mining Agreements*, 27A Rocky Mtn. Min. L. Inst. 887, 887 (1982) [hereinafter "Sager & Henderson"].

Many legal scholars contend that landlord-tenant or real property law concepts should not be mechanically applied in mining and oil and gas cases.[7] They argue that the nature of a mineral lease bears little similarity to a real property lease and its purpose differs.[8]

Courts which have adopted a landlord-tenant approach to the assignment-sublease distinction in the area of mineral rights have come to different conclusions on whether the reservation of an overriding royalty by the lessee-transferor transforms the transaction from an assignment to a sublease. Sager & Henderson at 903. The majority of jurisdictions hold that the reservation of overriding royalties, and/or the right to reenter upon breach of the contract does not transform an assignment to a sublease in the area of mineral or oil and gas leases.[9] However, other courts hold

---

**6.** However, as noted above, in the real property area, the Utah Supreme Court has stated, in dicta, that the mere reservation of rents does not transform a conveyance from an assignment to a sublease. *Jensen v. O.K. Inv. Corp.*, 29 Utah 2d 231, 507 P.2d 713, 716 (1973) (quoting 3A *Thompson on Real Property* § 1210 (1959 Replacement)). This would seem analogous to the reservation of an overriding royalty in the area of mineral leases. In addition, the court has held that the reservation of the right to "reenter upon breach of the lease conditions would not change an assignment into a sublease." *L & M Corp. v. Loader*, 688 P.2d 448, 449 (Utah 1984); *see also Wangsgard v. Fitzpatrick*, 542 P.2d 194, 195 (Utah 1975).

**7.** The commentators H. Williams and C. Meyers are representative in their view that the real property approach to the assignment-sublease distinction should be abolished in the area of oil and gas leases. They conclude that the landlord-tenant analogy is:

utterly inappropriate to the law of oil and gas. A survey of lease and assignment forms reveals no word relative to subleasing as distinguished from assignment. The oil business simply has no conception of the distinction. To read the cases is to be convinced that it receives an *ex post facto* use, utterly dissociated from any intent of the parties. The results which follow from it, particularly with regard to the transferee's nonliability to the lessor, seem impolitic, contrary to the general understanding of those engaged in the business, and at variance with the practice of the industry. Since the oil and gas lease is not really a lease anywhere, there is no compulsion to make the distinction.... I suggest that a court whose decisions have not already recognized this distinction should weigh the consequences carefully before adopting it.

2 H. Williams and C. Meyers, *Oil and Gas Law* § 414, at 335 (1977) [hereinafter "Williams &

Meyers"] (quoting Merrill, *The Partial Assignee—Done in Oil*, 20 Tex.L.Rev. 298, 322 (1942); *see also* Swenson, *An Analysis of Mining Options and Leases*, 8 Rocky Mtn. Min. L. Inst. 47, 67 (1963).

**8.** "The most significant distinction of the mining lease is that, unlike the normal lease in which the tenant must maintain the premises and not commit waste, the mining lease anticipates that the lessee will permanently remove part or all of the value of the leased property." Sager & Henderson at 899. Further, "coal 'leases,' like oil and gas leases, are really contracts for the sale of, and the right to explore for and produce, a mineral. The sale of the mineral by leases is generally treated as the sale of personalty, rather than realty." Scott, *Coal Lease Assignments*, 8 Nat. Resources L. 467, 470 (1975–76).

**9.** *See, e.g., Moore v. Campbell*, 267 F.Supp. 126, 130 (N.D.Tex.1967) (mem.) (In the transfer of an oil and gas lease, the transferor reserved an overriding royalty and a production payment. The court held it was an assignment under Texas law, but found that distinction irrelevant for federal tax purposes.); *Chase v. Trimble*, 69 Cal.App.2d 44, 158 P.2d 247, 248–49 (1945) (The transfer of an oil and gas lease was held to be an assignment even though the original lessee retained an overriding royalty.); *Bellows Falls Trust Co. v. American Mineral Prods. Co.*, 89 N.H. 551, 3 A.2d 98, 101 (1938) (In a mineral lease, the assignment is not destroyed by reserving a new rent to the assignor with a power of re-entry for nonpayment.); *Holman v. State*, 438 N.W.2d 534, 540 (N.D.1989) (The transfer of an oil and gas lease was held to be an assignment even though the transferor reserved an overriding royalty because that is what the parties intended.); *Shearer v. United Carbon Co.*, 143 W.Va. 482, 103 S.E.2d 883, 886 (1958) (The

that a reservation of any interest, including an overriding royalty, converts an assignment to a sublease.[10] *See also* 3 W. Summers, *Law of Oil & Gas* § 553, at 602 (1958 & Supp.1989) [hereinafter "Summers"].

■ The real property landlord-tenant approach to the assignment-sublease distinction in the area of mineral leases has confused more than clarified what parties intended in these transactions. Therefore, we reject this approach as recommended by the commentators and adopt an analytical framework from what we consider to be the better-reasoned cases.[11] Thus, we focus on what the parties intended by their contract of conveyance. The parties' intent should be determined by normal tenets of contract construction.

A case illustrating this approach is *Holman v. State*, 438 N.W.2d 534 (N.D.1989). In this case, the North Dakota Supreme Court affirmed a grant of summary judgment because it found, in part, that the contractual language clearly stated an intent to assign all rights and interests. *Id.* at 540. The court discussed the unique nature of oil and gas leases and distinguished them from normal surface leases when deciding not to apply landlord-tenant principles in this area. *Id.* at 539. The court noted:

> Furthermore, in the ordinary assignment case, it is doubtful if the assignor realizes that by reserving an overriding royalty interest in the transfer of the oil and

gas lease the transaction could be classified as a sublease whereby he would be assuming all of the liability for the breach of the lease covenants by his assignee.

*Id.* at 540. *See also Sims v. Inexco Oil Co.*, 618 F.Supp. 183, 187 (S.D.Miss.1985) (mem.) ("the intent of the parties should control"); *Saling v. Flesch*, 85 Mont. 106, 277 P. 612, 613 (1929) ("Whether the instrument resulting in the conveyance ... was an assignment or a sublease depends upon the intention of the parties."); *Caudle v. Brannon*, 176 Okla. 394, 56 P.2d 131, 133 (1936) (the intent of the parties was controlling and could be found on the face of the instrument). *See also* Williams & Meyers § 414, at 336 ("The real question here is one of intention of the parties."); Summers § 553, at 601–02 (common practice in the industry reflecting the parties' intent would be thwarted if real property distinctions mechanically applied); *see generally supra* note 7 (commentators rejecting mechanical application of real property concepts).

■ Thus, the issue becomes whether Heiner and Hunter and Groves intended in their 1976 Groves Agreement to delegate the duties and assign the rights of Heiner and Hunter under the 1975 Dickert Agreement to Groves. If so, then Groves stepped into the shoes of Heiner and Hunter and was thus in privity of estate with Dickert and Eddy as well as privity of

---

court, in dicta, stated that the reservation of an overriding royalty, while indicative of a sublease, *alone* is not controlling on the issue of assignment or sublease.).

**10.** *See, e.g., Shreck v. Coates*, 59 Ariz. 269, 126 P.2d 308, 312 (1942) (The transfer of a mineral lease was held to be a sublease where, among other reserved rights, the original lessee retained an overriding royalty and a right of reentry.); *Garner v. Knudsen*, 129 Cal.App.2d 747, 277 P.2d 890, 896 (1955) (The transfer of an oil and gas lease was held to be a sublease where a right to reenter and an overriding royalty were reserved, however, the court focused on the right to reenter.); *Halbert v. Hendrix*, 121 Ind. App. 43, 95 N.E.2d 221, 223 (1950) (en banc) (In an oil and gas lease case, the court held that "a transfer of the leasehold is to be regarded as an assignment if the transferor retains no right of any kind therein, but will be deemed a sublease

if he reserves a rental or an overriding royalty."); *Robinson v. North Am. Royalties, Inc.*, 463 So.2d 1384, 1386 (La.Ct.App.1985), *modified on other grounds*, 470 So.2d 112 (La.1985) (In the transfer of an oil and gas lease, even though the instruments were designated assignments, the "assignor" reserved an overriding royalty, the instrument, in legal effect, was a sublease.); *Sunburst Oil & Ref. Co. v. Callender*, 84 Mont. 178, 274 P. 834, 838 (1929) (In the transfer of an oil and gas lease, even though the transferor "assigned" the leases, it reserved an overriding royalty, and the court found that reservation a substantial interest which should be protected, thus, the transfer was a sublease.).

**11.** In Utah, we can imply that the strict application of real property law may mandate that the reservation of an overriding royalty alone would not transform a transfer from an assignment to a subpurchase. *See supra* note 6.

contract with Heiner and Hunter and could therefore modify the obligation to mine coal as it did.

Courts have considered a number of factors when assessing the parties' contractual intentions, but the language in the instrument itself is of primary importance. *LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988); *G.G.A., Inc. v. Leventis*, 773 P.2d 841, 845 (Utah Ct.App. 1989).

In examining contractual language to determine whether the transfer was intended as an assignment or a sublease, courts have focused on whether the subsequent lessee assumed all the rights and obligations of the original lessee. *Reed v. R.M. Chapman Basting Co.*, 137 Minn. 442, 163 N.W. 794, 795 (1917) (the company which purported to assign the contract was not relieved of its obligations by the contract and, therefore, it was a subcontract rather than an assignment); *Paperchase Partnership v. Bruckner*, 102 N.M. 221, 693 P.2d 587, 589 (1985) (the transfer involved did not relieve the assignor of his liabilities and, thus, no assignment occurred).

Applying these principles, we are firmly convinced that the parties intended the 1976 Groves Agreement to be an assignment of all rights and obligations under the 1975 Dickert Agreement, not a mere subpurchase of the Dog Valley Coal Leases. The 1976 Groves Agreement assigned the Dog Valley Coal Leases to Groves and stated that Groves would "from and after the Closing perform and pay as and when due all obligations required under [the 1975 Dickert Agreement]." Under that express language, Heiner and Hunter assigned all of their rights and delegated their duties under the 1975 Dickert Agreement to Groves, retaining only an overriding royalty.

We conclude the 1976 Groves Agreement unambiguously assigned all rights and delegated all obligations under the 1975 Dickert Agreement to Groves.[12] Thus, Groves was in privity of estate with Dickert and Eddy and could enter into an agreement with them to terminate its obligation to mine coal and substitute a minimum royalty payment in place of that obligation. Groves could also voluntarily terminate its interest in the Dog Valley Coal Leases by reconveying those leases to Dickert and Eddy as provided by the terms of both the 1975 and 1981 Dickert Agreements.

### BREACH OF IMPLIED DUTY OF GOOD FAITH

Finally, Heiner and Hunter argue that Groves breached its implied duty of good faith and fair dealing when it ceased its mining operations, thus cutting off Heiner and Hunter's overriding royalty. However, this argument was not presented to the trial court. This court will not decide issues addressed for the first time on appeal. *Mascaro v. Davis*, 741 P.2d 938, 944 (Utah 1987); *James v. Preston*, 746 P.2d 799, 801 (Utah Ct.App.1987).

Even if the issue were properly before this court, there is no violation of the duty of good faith, as a matter of law, when a party is simply exercising its contractual rights. *See Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 505 (Utah 1980). Heiner and Hunter claim they were prejudiced because the 1981 Dickert Agreement did not extinguish Heiner and Hunter's contractual obligation to Dickert and Eddy to mine coal. On the contrary, Heiner and Hunter's obligation was satisfied when Groves reconveyed the Dog Valley Coal Leases to Dickert and Eddy in 1985. Even

12. We distinguish *Hansen v. Green River Group*, 748 P.2d 1102 (Utah Ct.App.1988), where this court held that a transfer of real estate by two separate contracts was a subpurchase rather than an assignment. *Id.* at 1104. In *Hansen*, the court found that the second transaction did not transfer any obligations from the first transaction. *Id.* The court concluded that the only obligation the second transferee had was to pay its own purchase price which was $80,000 less than the initial purchase price. *Id.* In addition, the instrument in the second transaction did not use any terms of assignment or assumption. *Id.* While the court implied that if the parties had intended an assignment, they could have merely executed a simple assignment rather than execute a new and separate contract, *id.*, we do not believe that a separate contract alone necessarily reflects the intent of a subpurchase rather than an assignment.

prior to that reconveyance, Dickert and Eddy would have been hard pressed to argue that Heiner and Hunter still owed them a duty to mine coal when they had agreed with Heiner and Hunter's assignee under the 1981 Dickert Agreement that mining could cease.

In conclusion, we affirm the trial court's dismissal of Heiner and Hunter's complaint for failure to state a claim upon which relief could be granted. Groves owed Heiner and Hunter no independent obligation to mine coal under the 1976 Groves Agreement. Heiner and Hunter assigned its rights and delegated its obligations under the 1975 Dickert Agreement to Groves, thus giving Groves the legal right to modify the 1975 Dickert Agreement. Finally, the issue of whether Groves breached an implied duty of good faith and fair dealing to Heiner and Hunter by contracting with Dickert and Eddy to relieve its obligation to mine coal was not properly raised and, if it had been properly raised, Groves did not breach that duty.

GARFF and ORME, JJ., concur.