24 F.3d 1263
 VALLEY CAMP OF UTAH, INC., a Utah corporation, Plaintiff-Appellant,
v.
Bruce BABBITT, Secretary of the Interior, Cy Jamison,
Director, Bureau of Land Management, United States
Department of the Interior; James Parker, Director, Utah
State Office, Bureau of Land Management, United States
Department of the Interior; Robert Lopez, Chief, Minerals
Adjudication Section, Utah State Office, Bureau of Land
Management, United States Department of the Interior;
United States Department of the Interior, Defendants-Appellees.
 No. 93-4067
 United States Court of Appeals,
Tenth Circuit.
 May 20, 1994.
Rehearing Denied July 22, 1994.
 
 John A. Snow, Van Cott, Bagley, Cornwall & McCarthy, (John S. Kirkham, Stoel Rives Boley Jones & Grey with him on the brief), Salt Lake City, UT, for plaintiff-appellant.
 Jacques B. Gelin, Atty., Dept. of Justice (Myles E. Flint, Acting Asst. Atty. Gen., Dept. of Justice, Washington, DC, David J. Jordan, U.S. Atty., Carlie Christensen, Asst. U.S. Atty., Salt Lake City, UT, Robert L. Klarquist, Atty., Dept. of Justice, and Karen Hawbecker, Office of Sol., Dept. of Interior, Washington, DC, of counsel, with him on the brief), for defendants-appellees.
 Before KELLY and SETH, Circuit Judges, and OWEN, District Judge.d
 PAUL KELLY, Jr., Circuit Judge.
 
 
 1
 Plaintiff-appellant Valley Camp, Inc. (Valley Camp) appeals from the district court's grant of summary judgment affirming an Interior Board of Land Appeals (IBLA) decision in favor of defendants-appellees. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 and we reverse and remand.
 
 Background
 
 2
 This appeal arises from the Bureau of Land Management's (BLM) attempt in 1982 to readjust the royalty rate on a federal coal lease which covered two separate mines owned and operated by two separate entities. Pursuant to 43 C.F.R. Sec. 3451.1(c)(1) (1981), the BLM notified the lessee of record in 1981 of its intention to readjust the lease. In 1986, after various administrative proceedings, the BLM implemented a readjusted royalty rate retroactive to 1982. The lessee of record then appealed to the IBLA. When a sublessee of the affected lands, Valley Camp, received notice of deficient royalty payments covering its separate operations for the period 1982 through 1986, it sought to intervene in the district court appeal but was denied. Pursuant to a Memorandum of Understanding (MOU) between the IBLA and Coastal States, the operator of one of the mining operations and the lessee of record, the appeal was abandoned and a decision issued stating that the lease, as amended, was effective from May 1, 1982. A copy of this decision was sent to Valley Camp which again protested to the BLM, arguing that the BLM had not made necessary predicate determinations regarding its output to readjust the royalty rate. The BLM rejected this argument, reasoning that Valley Camp had no right to participate in readjustment negotiations, given its lack of privity with the BLM as a result of its status as sublessee. The IBLA affirmed the BLM's action. The district court granted summary judgment in favor of the BLM, and Valley Camp appealed.
 
 A. Interests in the Lease
 
 3
 On March 1, 1962, the United States leased coal lands located in Carbon and Emery Counties, Utah, lease number 020305 (hereinafter "the lease"), to Emmett K. Olson. The lease reserved to the government the right to receive royalty payments on the coal recovered from the leased lands, as well as the right reasonably to readjust any term of the lease after twenty years and every twenty years thereafter. The lease also provided that the "lessee hereby agrees: ... [t]o file for approval [with the BLM], within 90 days from the date of execution, any assignment or transfer made of this lease, whether by direct assignment, operating agreement, working or royalty interest, or otherwise." Aplt.App. at 67.
 
 
 4
 Mr. Olson, on April 24, 1962, assigned the lease to Malcolm N. McKinnon. This assignment was approved by the BLM on July 20, 1962. On May 10, 1974, Mr. McKinnon entered into an option agreement with Oak Creek Development (Oak Creek) whereby Oak Creek was given the right to prospect for coal on the subject lease for a period of one year, with an option to acquire a sublease of the lands at the conclusion of the prospecting period. Additionally, if certain payments under the sublease were made, Mr. McKinnon also agreed to execute an assignment of the record title to the lease. The option agreement could not be assigned without the permission of Mr. McKinnon.
 
 
 5
 On August 1, 1974, Oak Creek, with Mr. McKinnon's approval, assigned all its rights in the option agreement to Routt County Development (Routt County). Routt County, on September 15, 1975, subleased a part of the property, known as the O'Connor block, to Energy Fuels, reserving an overriding royalty interest in the coal production from this portion of the land. On October 29, 1975, Routt County exercised its option with Mr. McKinnon.
 
 
 6
 Pursuant to a September 15, 1975 exchange agreement concerning various federal coal leases, Energy Fuels, on November 5, 1975, assigned its interest in the O'Connor block to Valley Camp. On August 2, 1978, Routt County, successor to Energy Fuels, assigned the exchange agreement, subject to Valley Camp's interest, to Coastal States. On August 3, 1978, Coastal States also received an assignment from Routt County of all its rights in the September 15, 1975 sublease to Energy Fuels, again subject to the earlier Valley Camp assignment. As a result, Valley Camp and Coastal States became co-operators on the lease, with Valley Camp operating the Belina mine on the O'Connor block and Coastal States operating the Skyline mine on the remainder of the property known as the Connelville block. All of the foregoing instruments were submitted to the BLM in a timely fashion and each was approved.
 
 
 7
 During late 1982, after all payments contemplated by the Routt County sublease were made, Mr. McKinnon assigned the record title to the lease to Routt County, which immediately assigned record title to Coastal States pursuant to the earlier agreements. These transfers were approved by the BLM in early 1983, and, as a result, Coastal States became lessee of record for Utah-020305.
 
 
 8
 B. Readjustment of the Royalty Rate for the Lease
 
 
 9
 By letter dated October 7, 1981, the BLM notified Mr. McKinnon, as lessee of record, of its intention to readjust the terms of the lease, effective March 1, 1982, pursuant to 43 C.F.R. 3451 (1981). The BLM sent copies of this notice to all interested owners, including Valley Camp. On February 22, 1982, the BLM sent notice of the proposed terms of the readjustment to Mr. McKinnon and copies to all interest owners, including Valley Camp. Mr. McKinnon timely filed objections to the proposed readjustment with the BLM. The BLM overruled these objections in part and sustained them in part when it entered its decision implementing the new royalty rate on November 10, 1982. Mr. McKinnon appealed this decision to the IBLA, arguing, among other things, that the BLM had failed to consider a royalty rate of less than 8% for underground production of coal as provided by 30 U.S.C. Sec. 207(a) (1982).
 
 
 10
 The IBLA affirmed the BLM's decision with regard to the readjusted royalty rate but reversed in part, on other grounds, and remanded. On May 28, 1985, the BLM issued its decision implementing the IBLA's decision. Valley Camp did not receive a copy of the implementation decision. Subsequently, in an unrelated case, the Tenth Circuit held that the BLM could not automatically readjust production royalty rates to 8% without regard to specific production capacities of the leased land, as required by 43 C.F.R. 3473.3-2(a)(3) (1979). Coastal States Energy Co. v. Hodel, 816 F.2d 502, 507 (10th Cir.1987). Coastal States, as substituted party-appellant, appealed from the BLM's 1985 decision, arguing, among other things, that the BLM had erred in automatically readjusting the royalty rate in light of the Tenth Circuit's recent decision.
 
 
 11
 Upon learning of the implementation decision and Coastal States' appeal therefrom, Valley Camp moved to intervene in the appeal. Valley Camp was again rebuffed. In an October 18, 1988, decision, the IBLA set aside the BLM's decision with regard to the readjusted royalty rate and remanded for a BLM determination of whether a royalty rate less than 8% was warranted. On October 17, 1988, Coastal States and the BLM signed a Memorandum of Understanding that resolved most of the issues then pending before the IBLA. In the MOU, Coastal States specifically agreed to a royalty rate covering Coastal States' production of 8% and also agreed to dismiss and terminate, with prejudice, all pending litigation and dismiss and terminate, without prejudice, all pending administrative actions concerning Coastal States' interests in the lease.
 
 
 12
 Pursuant to the MOU, the BLM issued a decision on August 27, 1990, which informed Coastal States that all terms of the lease, as readjusted, were considered effective as of May 1, 1982, including the 8% royalty rate. A copy of this decision was also sent to Valley Camp. Valley Camp responded with a letter on March 19, 1990, notifying the BLM that Valley Camp did not consider itself bound by the terms of the MOU because it was not a party to nor was it notified of any negotiations regarding royalty rates. Valley Camp also charged that the BLM had failed to comply with federal regulations in readjusting its production royalty rate. On August 28, 1990, the BLM sent a letter to Valley Camp explaining that the MOU set the royalty rate for all land encompassed by the lease, including the O'Connor block. The letter further stated that the BLM was not required to notify Valley Camp of the readjustment proceedings due to its status as a sublessee when, according to its interpretation of applicable regulations, only lessees of record were required to be notified. Valley Camp appealed this decision to the IBLA, which affirmed the BLM's actions.
 
 
 13
 Having exhausted its administrative remedies, Valley Camp brought suit in federal district court, claiming that the BLM had readjusted the royalty rate on Valley Camp's production without proper notice required by federal regulation. The district court granted summary judgment in favor of the BLM, ruling the BLM had not unreasonably interpreted federal regulations regarding royalty rate readjustment, and Valley Camp appealed.
 
 Discussion
 I. Standard of Review
 
 14
 We review de novo the district court's grant of summary judgment and we apply the same legal standard used by the district court in evaluating the summary judgment motion, namely Fed.R.Civ.P. 56(c). Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). More specifically, in reviewing a district court's review of an agency decision, " 'the identical standard of review is employed at both levels; and once appealed, the district court's decision is accorded no particular deference.' " First Nat'l Bank of Fayetteville v. Smith, 508 F.2d 1371, 1374 (8th Cir.1974), cert. denied, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975) (quoted in Webb v. Hodel, 878 F.2d 1252, 1254 (10th Cir.1989)).
 
 
 15
 II. BLM's Interpretation of Readjustment Notice Requirements
 
 
 16
 The threshold issue that we must address involves the BLM's interpretation of federal regulations concerning readjustment of royalty rates on coal produced from federally leased lands. We must leave undisturbed agency actions which cannot be characterized as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). Generally, if Congress has not directly addressed the issue, the agency possesses broad discretion in administering the law so long as its actions are based on a permissible construction of its enabling statute. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). This discretion is even greater where, as here, the agency's actions are based on the interpretation of its own regulations. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Only if such interpretation is clearly erroneous or inconsistent with the regulation will we strike the agency action. Id. at 16-17, 85 S.Ct. at 801-02; TransCanada Pipelines Ltd. v. Federal Energy Reg'y Comm'n, 878 F.2d 401, 411 (D.C.Cir.1989). Such deference, however, does not obtain where the agency's interpretation of its regulations is inconsistent with its prior administrative interpretations. Shoshone Indian Tribe v. Hodel, 903 F.2d 784, 787 (10th Cir.1990); Cf. Good Samaritan Hosp. v. Shalala, --- U.S. ----, ----, 113 S.Ct. 2151, 2161, 124 L.Ed.2d 368 (1993) (" '[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view.' ") (quoting I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1220 n. 30, 94 L.Ed.2d 434 (1987) (quoting Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)).
 
 
 17
 The BLM argues that because the regulations provided "[t]he authorized officer shall, prior to the expiration of the current or initial 20-year period or any succeeding 10-year period thereafter, notify the lessee of any lease which becomes subject to readjustment ...," 43 C.F.R. Sec. 3451.1(c)(1) (1990) (emphasis in BLM's Letter to Valley Camp), Aplt.App. 217-18), the BLM was not required to notify sublessees, such as Valley Camp, of attempted readjustments to lease terms, nor was it required to allow them to participate in such proceedings.[1] Valley Camp disputes this interpretation, pointing to the BLM's practice of notifying all entities with interests in the affected lease of readjustment proceedings and the codification of such practices in the form of a 1985 BLM instruction memorandum to that effect. Aplt.Br. at 32-33. The BLM dismisses this argument by characterizing the instruction memorandum as merely a "courtesy" to all interested parties and not a requirement imposed by law. Aplee.Br. at 21 (citing Valley Camp of Utah, Inc., 120 I.B.L.A. 201, 207 (1991)). Because there is an apparent inconsistency between the 1985 instruction memorandum and the BLM's interpretation of the regulations in this case, we need not accord the agency's interpretation in this appeal as great a deference as normally would obtain. Shoshone Indian Tribe, 903 F.2d at 787.
 
 
 18
 The parties, as well as the IBLA and district court, have assumed incorrectly that the regulations in effect at the time of the dispute answer the question of whether Valley Camp was entitled to notice of and participation in the readjustment proceedings. Because Congress specifically provided that changes to federal coal leases would occur only "at the end of [not during] its primary term," 30 U.S.C. Sec. 207 (1962), any regulatory changes occurring during such primary term would not operate over pre-existing leases. Thus, only the terms of the lease and then-existing regulations incorporated by reference would control. If the lease or then-existing regulations referenced by the lease afford different notice and/or rights to participate in readjustment proceedings to different parties as a function of their interest in the lease, we look to state law to decide the relation of Valley Camp to the BLM under the lease. See United States v. Van Diviner, 822 F.2d 960, 963 (10th Cir.1987). The status of Valley Camp in the context of applicable regulations, if any, will then determine whether Valley Camp was entitled to notice of, and the right to participate in, readjustment proceedings. If, however, no such distinction between parties exists under the regulations, our inquiry ends because all interested parties, including Valley Camp, would be entitled to notice and participation regardless of their relation to the BLM.
 
 
 19
 The lease entered into between Mr. Olson and the BLM in 1962 provides: "This lease [between the United States and Emmett K. Olson is made] pursuant and subject to the terms and provisions of the act of February 25, 1920 (41 Stat. 437), as amended, ... and to all reasonable regulations of the Secretary of the Interior now in force which are made a part hereof...." Aplt.App. at 67 (emphasis added). The lease further provides:
 
 Sec. 3. The lessor expressly reserves:
 
 20
 * * * * * *
 
 
 21
 (d) Readjustment of terms. The right reasonably to readjust and fix royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof and thereafter at the end of each succeeding 20-year period during the continuance of this lease unless otherwise provided by law at the time of the expiration of any such period.
 
 
 22
 Aplt.App. at 68 (emphasis added). These provisions mirror the statute in that only then-existing regulations will operate over the lease during its primary term. Because all relevant transfers occurred during this primary term, we look only to regulations in effect in 1962.[2]
 
 
 23
 This conclusion might seem to end further consideration of this appeal in that the appeal centers on the BLM's interpretation of a 1990 regulation. The 1990 regulation at issue, however, does not vary from the notice provision of the 1962 regulation or those found in the original lease. See 43 C.F.R. Sec. 193.16 (1962) ("The lessee will be notified of the proposed readjustment of terms or notified that no readjustment is to be made."); Aplt.App. at 68 ("Unless the lessee files objections to the proposed terms ... he will be deemed to have agreed to such terms."); 43 C.F.R. Sec. 3451.2(a) (1990) ("the authorized officer ... shall notify the lessee by decision of the readjusted lease terms."). We can therefore assume that the BLM's interpretation of the 1990 regulation applies equally to the 1962 regulation.
 
 
 24
 We must preface further discussion of the interpretation of the notice regulation with a brief explanation of an IBLA decision that will guide us to pertinent regulations in effect at the execution of the lease. In Consolidation Coal Co., 87 I.B.L.A. 296 (1985), the IBLA held that the BLM must notify an approved assignee of proposed readjustments to lease terms for a readjustment to be valid. Id. at 302-303. The IBLA reasoned that because no agency relation existed between assignor and assignee, notice to the assignor was not sufficient to satisfy the requirement that the BLM notify the "lessee" of proposed readjustments to the lease. Id. at 301-302. The IBLA thus equated an assignee with a lessee of record, entitling an assignee to all rights possessed by lessees of record.
 
 
 25
 Under this decision, in conjunction with the BLM's interpretation that only lessees of record are entitled to notice of such proceedings, an assignee of a lease is entitled to the same notice afforded lessees of record. As a result, when the BLM maintains that Valley Camp was not entitled to notice of readjustment proceedings, it is resting its position solely on its view that Valley Camp is a sublessee rather than an assignee under the lease. If the 1962 regulations make no distinction, or if they do but Utah state law makes no such distinction, Valley Camp effectively was an assignee under the lease and therefore was entitled to notice and possessed a right to participate. Accordingly, we focus our discussion of the 1962 regulations, and possibly Utah law, on the existence of a distinction between assignees and sublessees under federal coal leases.
 
 
 26
 Section 193.25 of the regulations to Title 30 (43 C.F.R.) provided:
 
 
 27
 (b) The transferor of a permit or lease, including a sublease, and his surety will continue to be responsible for the performance of any obligation under the permit or lease until the effective date of the approval of the transfer. If the transfer is not approved, their obligation to the United States shall continue as though no such transfer had been filed for approval. After the effective date of approval the transferee, including sublessee, and his surety will be responsible for the performance of all permit or lease obligations notwithstanding any terms in the transfer to the contrary.
 
 
 28
 (emphasis added). Because we have found no agency interpretation of this regulation, we employ the standard rules of statutory construction, beginning with the plain meaning of its terms. See United States v. Fleming, 19 F.3d 1325, 1329-30 (10th Cir.1994). The language of the regulation, as well as the language of the lease, Aplt.App. at 67, clearly makes no distinction between an assignee and sublessee under a coal lease, and with good reason. To make such a distinction, and to have that distinction determine which type of transferee is entitled to notice, makes no sense in the realm of mineral leases. Accord Heiner v. S.J. Groves & Sons Co., 790 P.2d 107, 114 (Utah App.1990); Robert W. Swenson, An Analysis of Mining Options and Leases, 8 Rocky Mtn.Min.L.Inst. 47, 61-67 (1963); see also Jeffrey J. Scott, Coal Lease Assignments, 8 Nat. Resources Law. 467, 470 (1975) ("[C]oal 'leases,' like oil and gas leases, are really contracts for the sale of, and the right to explore for and produce, a mineral.").
 
 
 29
 Generally, the transfer of interests under a coal lease involves retention of only overriding royalty interests and/or rights of reentry to protect such royalty interests of the transferor. See Richard K. Sager and Jeanne Henderson, Assignment Provisions in Mining Agreements, 27A Rocky Mtn.Min.L.Inst. 887, 902-906 (1982). The BLM's conclusion that only lessees of record and assignees--i.e., those who normally possess only an overriding royalty interest in the lease and do not operate the lands--are entitled to notice of and participation in readjustments to the lease comports with neither common sense nor the plain meaning of applicable 1962 regulations. Those who are in actual possession of the land, who are known to the BLM via mandatory approval by the BLM of the transfer that created their interest, and who are directly and solely responsible for the performance of all lease provisions under 43 C.F.R. Sec. 193.25, including payment of royalty, are entitled to be heard on readjustments to provisions that affect them solely and directly. This regulation completely refutes the BLM's argument that Valley Camp lacked privity with the BLM. Neither the statute, regulations, nor any internal BLM memoranda of which we have been made aware make any mention of the term "lessee of record."
 
 
 30
 We do not find the BLM distinction between assignees and sublessees in either the regulations, the lease or indeed under Utah law. Perhaps, if Utah would classify Valley Camp as a sublessee the BLM might be justified in excluding Valley Camp from readjustment proceedings under the 1962 regulations. Both the IBLA and the district court based their interpretation of Utah law on Heiner v. S.J. Groves & Sons Co., 790 P.2d 107 (Utah App.1990), and concluded that Valley Camp would properly be characterized as sublessee under these facts. We disagree.
 
 
 31
 In Heiner, the Utah Court of Appeals eschewed the application of real property distinctions in the area of coal leases. Instead, the court instructs us to look to the intent of the parties, divined through normal tenets of contract construction, in determining the relation of those party to the transfer of interests in coal leases. Heiner, 790 P.2d at 114. The intent of the parties here, regarding the type of relation created, can be no more easily found than in the instrument by which the relation was created.
 
 
 32
 Valley Camp obtained whatever interest it possesses in the lease through a full assignment from Energy Fuels, which obtained its interest from Routt County. Therefore, Valley Camp may be classified as a sublessee only if Energy Fuels could be classified as such under the transfer from Routt County.
 
 
 33
 The 1975 transfer to Energy Fuels contains a section entitled "Relationship of Parties" that states:
 
 
 34
 It is fully understood that the relationship between the parties hereby shall be that of landlord and tenant governed by the present or future laws of the State of Utah and that such relationship shall never be interpreted or established as that of partners, joint venturers, covenants, principal and agent, or any relationship other than that of landlord and tenant.
 
 
 35
 Aplt.App. at 150. The BLM seems to argue that this language in some way restricts Valley Camp's interest in the lease. We disagree.
 
 
 36
 This language does not establish a subtenancy as the IBLA and district court concluded. It is a standard provision found in mineral interest transfer documents that insures the lessor will not be found vicariously liable for the act of the lessee-operator. Regardless, Utah law informs us that we must focus on "whether the subsequent lessee assumed all the rights and obligations of the original lessee." Heiner, 790 P.2d at 115 (citations omitted). If we find a complete assumption of all obligations on the part of Energy Fuels we may infer that the transaction was intended as an assignment. Id.
 
 
 37
 Section 193.25 of the regulations to Title 30 (43 C.F.R.), which was incorporated into the lease by reference, Aplt.App. at 67, states: "After the effective date of approval the transferee, including sublessee, and his surety will be responsible for the performance of all permit or lease obligations notwithstanding any terms in the transfer to the contrary." (emphasis added). Therefore, Energy Fuels, and subsequently Valley Camp, assumed all obligations under the lease upon the approval by the BLM of the transfer. Moreover, a retained overriding royalty interest constitutes the sole right reserved by Routt County under the transfer. The Utah Court of Appeals instructs us that the mere reservation of an overriding royalty interest will not support an inference that the parties intended a sublease rather than an assignment. Heiner, 790 P.2d at 114 n. 11. Accordingly, the transfer from Routt County to Energy Fuels, and the subsequent transfer to Valley Camp, can only be characterized as assignments under Utah law.
 
 
 38
 Because Valley Camp is an assignee under either federal law or Utah law, Valley Camp was entitled to notice of and participation in the readjustment proceedings. Consolidation Coal, 87 I.B.L.A. at 301.
 
 
 39
 III. Waiver of Valley Camp's Right to Object to Readjustment
 
 
 40
 Alternatively, the BLM argues that even if Valley Camp was entitled to notice and participation, Valley Camp waived its right to object to royalty readjustments by failing to object timely to the proposed readjustment, and/or by acquiescing to Coastal States' representation of all lessees' interests under the lease.
 
 
 41
 The BLM's argument that Valley Camp did not timely object to the proposed readjustments is disingenuous at best. The BLM has maintained throughout the readjustment process that Valley Camp had no right to contest the readjustment. Indeed, when Valley Camp sought to intervene in the appeal to the IBLA on its own behalf it was denied for that reason. Valley Camp of Utah, Inc., 120 I.B.L.A. 201, 205 n. 3 (1991). Given this consistent position by the BLM and the IBLA, it would defy reason to deny Valley Camp a right to be heard when such right is finally recognized.
 
 
 42
 The BLM's second argument hinges on whether Coastal States had the power to bind Valley Camp with respect to its right to protest readjustments, and if so, whether the MOU entered into between Coastal States and the BLM, purportedly on behalf of Valley Camp, foreclosed Valley Camp's right to object to the royalty rate readjustment.
 
 
 43
 Assuming that Coastal States possessed the power to bind Valley Camp with respect to BLM proceedings, the only act purportedly performed on behalf of itself and its "sublessees" was the execution of the MOU. It was this MOU that apparently precipitated the BLM's 1990 decision to readjust retroactively the royalty rate on coal produced on all lands described in the Utah-020305 lease. However, the MOU executed by Coastal States agreeing to a readjustment to an 8% royalty rate clearly pertains only to coal produced by Coastal. Aplt.App. at 202-206. Nowhere in the MOU does it mention the royalty rate on coal not produced by Coastal States, such as that produced by Valley Camp. Since Valley Camp's royalty rate readjustment was not mentioned in the MOU, Coastal States did not, assuming it could, bind Valley Camp to the terms of that agreement.
 
 
 44
 Absent an agreement or specific findings regarding the production from an operator's mine, the BLM may not automatically readjust the royalty rate to 8%. Coastal States, 816 F.2d at 507. The BLM did not have an agreement regarding Valley Camp's coal and did not investigate its production. Because the BLM did not satisfy either of these prerequisites to readjustment, and because the BLM excluded Valley Camp from readjustment proceedings when Valley Camp possessed the right to be heard, the BLM's 1990 decision to retroactively apply an 8% royalty rate is invalid as to Valley Camp.
 
 
 45
 The failure to provide interested parties with the opportunity to contest proposed readjustments to coal leases also constitutes a waiver by the government of the right to readjust the lease for the ten-year period at issue. Consolidation Coal, 87 IBLA at 302-303. Because the BLM failed to provide Valley Camp notice and the attendant right to participate in readjustment proceedings regarding the term from 1982 to 1992, its readjustment of the lease was invalid. Thus, the lease remained as it read in 1962 for the period between March 1, 1982, and March 1, 1992, rendering the BLM's attempt at collection of deficient royalty payments from Valley Camp unwarranted.
 
 IV. Conclusion
 
 46
 The BLM erroneously excluded Valley Camp from readjustment proceedings and thus its subsequent attempt to readjust automatically Valley Camp's production royalty rate was wholly ineffective. Accordingly, the grant of summary judgment in favor of the BLM is REVERSED and the cause REMANDED to the district court with instructions to VACATE its judgment in favor of defendants-appellees and enter judgment in favor of Valley Camp.
 
 
 
 d
 The Honorable Richard Owen, Senior United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Implicit in the BLM's view that Valley Camp was not entitled to participate in readjustment proceedings is its view that only lessees of record may appeal the decision of the readjustment decision of the authorized officer of the BLM under 43 C.F.R. Sec. 3452.2(d) (1993). Seemingly unaware of this distinction, the BLM has assumed throughout this litigation that a party who is entitled to notice of readjustment proceedings is also entitled to participate in those proceedings. We will not disturb an agency's grant of greater procedural safeguards to individual's rights
 
 
 [2]
 Even if we assume that parties taking interests under the lease are subject to the regulations in effect at the time of transfer our analysis remains unaffected because the relevant regulations did not change until after all pertinent transfers were effected. Compare 43 C.F.R. Sec. 193.25 (1962) (approved transferee solely liable for breach of lease) and 43 C.F.R. Sec. 3506.2-3(b) (1973), (1974), (1975), (1976) (same) with 43 C.F.R. Sec. 3506.5-2 (1993) (approved assignee of interest in lease becomes solely liable for breaches of the lease while sublessor and sublessee of lease are jointly and severally liable)